NAUMES FORWARDING SERVICE *v.* UNITED STATES (No. 4795)[1]

[1] C. A. D. 581.

United States Court of Customs and Patent Appeals, February 8, 1955

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for appellant.
*Warren E. Burger*, Assistant Attorney General (*Richard E. FitzGibbon, Dorothy C. Bennett*, and *Daniel I. Auster*, special attorneys, of counsel), for the United States.

[Oral argument October 14, 1954, by Mr. Schwartz and Mr. Auster

Before O'Connell, Acting Chief Judge, and Johnson, Worley, and Cole, Associate Judges

Worley, Judge, delivered the opinion of the court:

This appeal brings before us for review a judgment of the United States Customs Court, Third Division, rendered pursuant to its decision, C. D. 1545, overruling four protests of appellant, consolidated for trial below, covering six importations from Italy of concentrated lemon juice entered at the port of Chicago in 1950. It is agreed that the rate and classification of the merchandise come within the provisions of paragraph 806 (b) of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, which reads:

| Tariff Act of 1930, paragraph | Description of Products | Rate of duty |
|---|---|---|
| 806 (b) | Concentrated juice of citrus fruits, fit for beverage purposes, and syrups containing any of the foregoing, all the foregoing, whether in liquid, powdered, or solid form: <br> *     *     *     *     * <br> Lemon, orange, and other (except naranjilla (*solanum quitoense lam*) _____ | 35¢ per gal. on the quantity of unconcentrated natural fruit juice contained therein as shown by chemical analysis |

Appellant is a customshouse broker for the Realem-on-Puritan Company which imports practically all of the concentrated lemon juice entering this country. It is engaged in reconstituting the juice to its original strength, then bottling and selling it. Its initial importations covered a two month period in the latter part of 1949 and consisted of six entries representing a volume of approximately $127,000. In liquidating those entries the collector employed a ratio ranging from 4.3 to 5.4 gallons of natural juice to one gallon of the concentrate. The manager of the importing company testified that on the strength of those ratios, substantial additional quantities of the merchandise were imported during 1950. However, in the liquidation of the latter entries, those now before us, the collector employed a new ratio of 6 to 1 except for one entry which was 5½ to 1.

Appellant protested the action of the collector on the ground that prior to the 1950 importations an "established and uniform practice" had existed for determining the quantity of unconcentrated fruit juice; that said practice was changed by the Bureau of Customs, resulting in higher duties; and that the change was made without publication of notice as required by the provisions of section 315 of the Tariff Act of 1930 which, so far as pertinent, reads:

\* \* \* No administrative ruling resulting in the imposition of a higher rate of duty or charge than the *Secretary of the Treasury shall find* to have been applicable to imported merchandise under an *established and uniform practice* shall be effective with respect to articles entered for consumption or withdrawn from warehouse for consumption prior to the expiration of thirty days after the date of publication in the weekly Treasury Decisions of notice of such ruling: \* \* \* (Italics ours.)

It is conceded that no thirty day notice was published.

In overruling the protests the Customs Court relied principally on the case of *Washington Handle Co.* v. *United States*, 34 C. C. P. A. (Customs) 80, C. A. D. 346. From that judgment, appellant renews its original contentions.

It appears that the ratios employed in liquidation of the 1949 entries were based on a "U. S. Customs Laboratory Method No. 806.1–48 (Tentative)" used in conjunction with a book dealing with the composition and structure of foods. However, in June of 1950, instructions from the Bureau of Customs as to how the proportions should be determined were requested by the collector because the acting chief chemist had stated that the percentages of the ingredients in unconcentrated lemon juice varied with the seasons and other factors, and it was his belief that a more accurate result would be obtained if the analysis were compared with that of the actual unconcentrated lemon juice from each importation. That inquiry was followed by a letter dated December 26, 1950, in which the Bureau directed the collector to use a different method, one which was based on "the best current and authentic data on the composition of normal

lemon juice now available, * * *." Pursuant thereto, the latter method, the accuracy of which is not contested by appellant, was used in liquidating the 1950 entries.

The fact that the instant invoices are made out on a basis of a 6 to 1 ratio was explained by one of appellant's witnesses as follows:

When we approached Italy, we knew that Italy in itself, in its sales to European countries was accustomed to concentrate, let's say somewhere around 4 gallons to one. What we wanted was a much higher concentrate and we specified that we wanted about 6 to 1, but we qualified that by declaring approximate acidity; therefore the 6 to 1 was merely an indication to them of the approximate concentration that we expected in acidity which was specified at that time.

From our examination of the several cases cited by counsel for the respective parties, we are in accord with the Customs Court that the most apposite is the *Washington Handle Co.* case, *supra*. That case involved the classification of broom handles by two collectors in the same district in connection with 28 shipments covering a two year period. In view of the similarity of those facts to the instant appeal, we quote at some length therefrom:

In the Customs Administrative Act it will be noted that notice and the 30 days' waiting period are not required unless it is found by the Secretary of the Treasury that "an established and uniform practice" is affected by the change. The Secretary of the Treasury found that there was no such practice. If this matter was entrusted to the Secretary by Congress, it is no concern of ours. But in view of the contentions of the importer, we think it proper to say that 28 shipments of the instant imported materials at two subports, under the circumstances herein recited, cannot properly be held to constitute "an established and uniform practice" in respects with which we are here concerned.

Appellant argues in effect that the collectors at these subports had in effect established the practice and that therefore it could not be changed except by an act of Congress * * *. If 28 shipments establish a uniform practice, a much less number could be held to do the same. If two shipments had been the only shipments arriving in the United States it could also be argued that the levying of a 5 per centum duty on each shipment made the practice uniform. We think it clear that the collectors erred in their original classification of merchandise such as that involved here and the record shows that there was doubt in the minds of the shippers and the collectors when the importations of this character of merchandise began in 1939. * * *

\*        \*        \*        \*        \*        \*        \*

* * * Congress, two years after this trade agreement went into effect, provided that "no administrative ruling resulting in the imposition of a higher rate of duty or charge than *the Secretary of the Treasury shall find to have been applicable to imported mrchandise under an established and uniform practice*, shall be effective, etc." In other words, Congress provided that it was for the Secretary of the Treasury to determine the necessity of giving notice before changing a holding by the collector; and if Congress, as we think it has, entrusted this matter to the Secretary of the Treasury * * * it supersedes anything in the Colombian Trade Agreement even if it could be held that the framers of that agreement, when the term "established and uniform practice" was used, had in mind rulings by one or more collectors such as is shown by the instant record... * * * (Italics quoted.)

While appellant, in attempting to distinguish between the instant appeal and the above case, correctly points out that in the latter there is a specific negative finding by the Secretary of the Treasury that no established and uniform practice existed, we do not see that the distinction has any material significance to the facts here.

The judgment of the trial court is *affirmed.*

On account of illness, GARRETT, Chief Judge, did not participate in the hearing or decision of this case.